**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 1:25-cv-23232-GAYLES**

**PRESIDENT DONALD J. TRUMP,**

**Plaintiff,**

**v.**

**DOW JONES & COMPANY, INC. d/b/a THE WALL STREET JOURNAL, NEWS CORPORATION, KEITH RUPERT MURDOCH, ROBERT THOMSON, KHADEEJA SAFDAR, and JOSEPH PALAZZOLO,**

**Defendants.**
______________________________________/

# ORDER

> Those who won our independence believed * * * that public discussion is a political duty; and that this should be a fundamental principle of the American government. They recognized the risks to which all human institutions are subject. But they knew that order cannot be secured merely through fear of punishment for its infraction; that it is hazardous to discourage thought, hope and imagination; that fear breeds repression; that repression breeds hate; that hate menaces stable government; that the path of safety lies in the opportunity to discuss freely supposed grievances and proposed remedies; and that the fitting remedy for evil counsels is good ones. Believing in the power of reason as applied through public discussion, they eschewed silence coerced by law—the argument of force in its worst form. Recognizing the occasional tyrannies of governing majorities, they amended the Constitution so that free speech and assembly should be guaranteed.

*New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964) (quoting *Whitney v. California*, 274 U.S. 357, 375-76 (1927) (Brandeis, J., concurring)).

Justice Brandeis's words, as relevant today as they were nearly a century ago, formed the "background" behind the Supreme Court's holding in *Sullivan*: the First Amendment "prohibits a public [figure] from recovering damages for a defamatory falsehood . . . unless he proves that the

statement was made with actual malice[.]" *Id.* at 270, 279-280 (internal quotation omitted). This constitutional protection is not limited to post-discovery motions and trial. Because "[t]he costs and efforts required to defend a lawsuit through [discovery] could chill free speech nearly as effectively as the absence of the actual malice standard altogether[,]" a public figure plaintiff must plausibly allege actual malice at the outset of the litigation. *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016).

This Order addresses President Donald J. Trump's second attempt to plead that Defendants Dow Jones & Company, Inc. d/b/a the Wall Street Journal ("Dow Jones"), News Corporation ("News Corp."), Keith Rupert Murdoch ("Murdoch"), Robert Thomson ("Thomson"), and journalists Khadeeja Safdar ("Safdar") and Joseph Palazzolo ("Palazzolo") (collectively, the "Defendants") acted with actual malice when they published an article in the *Wall Street Journal* ("WSJ") linking him to convicted sex offender Jeffrey Epstein ("Epstein").[1] [ECF No. 67]. As with his first attempt, he has failed.[2] Therefore, for the reasons below, Defendants' Motion to Dismiss the First Amended Complaint (the "Motion"), [ECF No. 68], is granted and President Trump's Amended Complaint is dismissed with prejudice.

## I. BACKGROUND

### A. The Article

On July 15, 2025, Palazzolo emailed then White House Press Secretary Karoline Leavitt ("Leavitt") advising her that Dow Jones intended to publish an article (the "Article") about a birthday letter that President Trump purportedly created for Epstein (the "Letter"). [ECF No. 67 ¶ 12]. President Trump and his team responded quickly. Leavitt called Palazzolo and told him that

---

[1] News Corp. wholly owns Dow Jones, which publishes the WSJ. Murdoch is a director and majority owner of News Corp. and Thomson is the CEO. Safdar and Palazzolo are journalists for the WSJ and wrote the Article.
[2] The Court has reviewed the Motion and the record, heard argument by counsel at the hearing on August 5, 2026, and is otherwise fully advised.

the "subject matter" of the proposed Article was false. *Id.* ¶ 13. President Trump, through counsel, denied writing the Letter and warned Dow Jones not to publish the story.[3] *Id.* ¶ 14. And President Trump directly told Murdoch that he had not signed or sent the Letter. *Id.* ¶ 16. When Murdoch responded that he would "handle it," President Trump thought the WSJ would not print the Article. *Id.* ¶ 17. Two days later, the WSJ online edition published the Article. [ECF No. 68-2].[4]

The title of the Article—"Jeffrey Epstein's Friends Sent Him Bawdy Letters for a 50th Birthday Album. One was from Donald Trump"—is in bold print, with a subtitle below reading "[t]he leather-bound book was compiled by Ghislaine Maxwell. The president says the letter 'is a fake thing.'" *Id.* Leading with a picture of President Trump with Epstein, the Article states the following, in pertinent part:

> It was Jeffrey Esptein's 50th birthday, and Ghislaine Maxwell was preparing a special gift to mark the occasion. She turned to Epstein's family and friends. One of them was Donald Trump.
>
> Maxwell collected letters from Trump and dozens of Epstein's other associates for a 2003 birthday album, according to documents reviewed by The Wall Street Journal.
>
> Pages from the leather-bound album—assembled before Epstein was first arrested in 2006—are among the documents examined by Justice Department officials who investigated Epstein and Maxwell years ago, according to people who have reviewed the pages. It's unclear if any of the pages are part of the Trump Administration's recent review.
>
> . . .
>
> The letter bearing Trump's name, which was reviewed by the Journal, is bawdy—like others in the album. It contains several lines of typewritten text framed by the outline of a naked woman, which appears to be hand-drawn with a heavy marker. A pair of small arcs denotes the woman's breasts, and the future president's signature is a squiggly "Donald" below her waist, mimicking pubic hair.
>
> The letter concludes: "Happy Birthday—and may every day be another wonderful secret."

---

[3] President Trump also denied writing the Letter in an interview before publication. *See* [ECF No. 68-2].
[4] The WSJ ran the Article on the front page of its print edition on July 18, 2025. [ECF No. 67 ¶ 80].

In an interview with the Journal on Tuesday evening, Trump denied writing the letter or drawing the picture. "This is not me. This is a fake thing. It's a fake Wall Street Journal story," he said.

"I never wrote a picture in my life. I don't draw pictures of women," he said. "It's not my language. It's not my words."

He told the Journal he was preparing to file a lawsuit if it published an article. "I'm gonna sue The Wall Street Journal just like I sued everyone else," he said.

. . .

Justice Department officials didn't respond to requests for comment or address questions about whether the Trump page and other pages of the birthday album were part of the agency's recent documents review. The FBI declined to comment.

. . .

Among those who submitted letters were billionaire Leslie Wexner and attorney Alan Dershowitz . . . Wexner declined to comment through a spokesman . . . Dershowitz, who represented Epstein after his first arrest, said, "It's been a long time and I don't recall the content of what I may have written.

. . .

The book was put together by a New York City bookbinder, Herbert Weitz, according to people who were involved in the process. Weitz, who died in 2020, listed Epstein as a client on his website in 2003.

It isn't clear how the letter with Trump's signature was prepared. Inside the outline of the naked woman was a typewritten note styled as an imaginary conversation between Trump and Epstein, written in the third person.

[Description of Conversation]

When he turned 50, Epstein was already wealthy from managing Wexner's fortune and was socializing with Trump, Clinton and other powerful people. He often entertained at this Manhattan townhouse, Palm Beach, Fla., home and private Caribbean island.

. . .

Epstein and Trump spent time together in the 1990s and early 2000s and were photographed at social events, including with Maxwell and Melania Trump. . . . Trump, along with others including Clinton, also appeared several times on flight logs for Epstein's private jet.

> A 2002 New York magazine profile of Epstein quoted Trump. "I've known Jeff for 15 years. Terrific guy," Trump said. "He's a lot of fun to be with. It is even said that he likes beautiful women as much as I do, and many of them are on the younger side. No doubt about it—Jeffrey enjoys his social life."
>
> Both men said that they subsequently had a falling-out. Trump has said their friendship ended before Epstein pleaded guilty to procuring a minor for prostitution in 2008, served time in a Florida jail and registered as a sex offender.
>
> . . .
>
> Maxwell, a British socialite, was convicted in 2021 of helping Epstein's sex-trafficking and sentenced to 20 years in prison. Maxwell didn't respond to a letter requesting an interview sent to her in prison. Arthur Aidala, an attorney who represented Maxwell, said, "At this point, she is focused on her case before the Supreme Court of the United States."
>
> . . .
>
> Epstein's associations with Trump and many powerful people have been well documented.

[ECF No. 68-2]. The Article was widely distributed and republished. [ECF No. 67 ¶¶ 76-87].

**B. The Original Complaint**

On July 18, 2025, President Trump filed this action against Defendants, alleging that the Letter is "fake" and Defendants concocted the story to defame him. [ECF No. 1]. The original Complaint (the "Complaint") set forth claims for defamation *per se* and defamation *per quod*. *Id.*

**C. The Maxwell Interview**

On July 24, 2025, the United States Department of Justice interviewed Ghislaine Maxwell ("Maxwell"). [ECF Nos. 67 ¶ 33 n. 2].[5] During her interview, Maxwell "stated, subject to penalty of perjury for lying to a federal officer, that she did not remember President Trump submitting a letter for Epstein's 50th Birthday." *Id.*

[5] President Trump cites the transcript of the interview in the Amended Complaint, [ECF No. 67 ¶ 33 n.2], and Defendants attached a portion of the transcript to the Motion as an exhibit, [ECF No. 68-8].

**D. The House Subpoena and Records Release**

On August 25, 2025, after President Trump filed this action, the Committee on Oversight and Government Reform of the United States House of Representatives (the "Committee") subpoenaed the Epstein Estate[6] for documents (the "Subpoena"). [ECF No. 68-3]. The Subpoena included a request to produce all letters in the Birthday Book. The Epstein Estate complied with the Subpoena, and on September 8, 2025, the Committee released the produced documents on its official webpage via a press release (the "Press Release"). [ECF No. 68-4]. The production included a copy of the Birthday Book. [ECF No. 68-5]. The Birthday Book includes a page matching the Article's description of the Letter (the "Produced Letter"). [ECF No. 68-6].

**E. The Second Article**

On September 8, 2025, the WSJ published an article titled "A Visual Breakdown of the Trump Birthday Letter to Epstein" which compares the signature and typeface, drawing style, third-person point of view, and diction in the Letter with prior communications by President Trump (the "September 8 Article"). [ECF No. 68-7]. The September 8 Article includes President Trump's denial that he wrote the Letter or drew the picture and Leavitt's statement in a social media post that President Trump did not draw the picture in or sign the Letter. *Id.*

**F. Dismissal of the Complaint.**

Defendants moved to dismiss the Complaint for failure to state a claim and asked the Court to take judicial notice of eleven documents, including the Subpoena, Press Release, Birthday Book, Produced Letter, articles about President Trump, and campaign statements by President Trump. [ECF Nos. 35, 38]. The Court granted in part and denied in part Defendants' motion to dismiss the Complaint, finding President Trump failed to plausibly allege that Defendants published the

[6] Epstein died on August 10, 2019.

Article with actual malice and failed to allege special damages for his defamation *per quod* claim. [ECF No. 65].[7] President Trump then sought leave to conduct limited discovery as to actual malice before amending his complaint. [ECF No. 60]. The Court denied his request. [ECF No. 66].

### G. The Amended Complaint

On May 27, 2026, President Trump filed his First Amended Complaint (the "Amended Complaint"), once again asserting claims for defamation *per se* (Count I) and defamation *per quod* (Count II). [ECF No. 67].

#### 1. Alleged Defamatory Statements

The Amended Complaint alleges that the Article "falsely and maliciously stated that President Trump authored, drew, and signed a letter wishing Epstein a happy fiftieth birthday," *id.* ¶ 20, and contends that the following statements from the Article are *per se* defamatory:

> The letter bearing Trump's name, which was reviewed by the Journal, is bawdy—like others in the album. It contains several lines of typewritten text framed by the outline of a naked woman, which appears to be hand-drawn with a heavy marker. A pair of small arcs denotes the woman's breasts, and the future president's signature is a squiggly "Donald" below her waist, mimicking pubic hair. *Id.* ¶ 38a.
>
> It isn't clear how the letter with Trump's signature was prepared. Inside the outline of the naked woman was a typewritten note styled as an imaginary conversation between Trump and Epstein, written in the third person. *Id.* ¶ 38b.
>
> Voice Over: There must be more to life than having everything, the note began. Donald: Yes, there is, but I won't tell you what it is. Jeffrey: Nor will I, since I also know what it is. Donald: We have certain things in common, Jeffrey. Jeffrey: Yes, we do, come to think of it. Donald: Enigmas never age, have you noticed that? Jeffrey: As a matter of fact, it was clear to me the last time I saw you. Donald: A pal is a wonderful thing. Happy Birthday — and may every day be another wonderful secret. *Id.* ¶ 38c.

It also alleges that the following statements from the Article are implicitly defamatory:

---

[7] The Court denied Defendants' request to incorporate by reference the Birthday Book and Produced Letter. While the Court took judicial notice of the Press Release and Subpoena, it did not take judicial notice of the documents produced in response to the Subpoena, several news articles about President Trump, or campaign statements. [ECF No. 65].

> Jeffrey Epstein's Friends Sent Him Bawdy Letters for a fiftieth[8] Birthday Album. One Was From Donald Trump. *Id.* ¶39a.
>
> It was Jeffrey Epstein's fiftieth birthday, and Ghislaine Maxwell was preparing a special gift to mark the occasion. She turned to Epstein's family and friends. One of them was Donald Trump." *Id.* ¶ 39b.
>
> The album had poems, photos and greetings from businesspeople, academics, Epstein's former girlfriends and childhood pals, according to the documents reviewed by the Journal and people familiar with them. *Id.* ¶39c.
>
> When he turned 50, Epstein was already wealthy from managing Wexner's fortune and was socializing with Trump, Clinton and other powerful people. He often entertained at his Manhattan townhouse, Palm Beach, Fla., home and private Caribbean island. *Id.* ¶ 39d.

President Trump contends that these statements are false because he (1) did not author, sign, or draw any portion of the Letter or direct anyone else to author it; (2) never made or dictated to anyone any of the statements in the voiceover or had any such conversation with Epstein as portrayed in the Letter; and (3) was not "childhood pals" with Epstein. *Id.* ¶¶ 42-47, 49. He also asserts that the voiceover's tone, cadence, and vocabulary are inconsistent with his character and personality. *Id.* ¶ 48.

**2. Actual Malice Allegations**

In attempting to plead actual malice, the Amended Complaint focuses on four overlapping areas. First, Defendants allegedly acted with actual malice by publishing the Article despite President Trump's denial of "the existence of the alleged letter." *Id.* ¶¶ 34, 75. Second, Safdar, Palazzolo, Dow Jones, and News Corp.'s (the "WSJ Defendants") pre-publication investigation of the facts underlying the Article was inadequate because they (1) only "reviewed" the Letter and did not have an actual copy in their possession; (2) should have reached out to Maxwell to verify information about the Letter but avoided communicating with her; and (3) alternatively, did

[8] In paragraphs 39a and 39b, the Amended Complaint uses the word "fiftieth." [ECF No. 67]. The Article uses the numerals "50th." [ECF No. 68-2].

consult with Maxwell but intentionally failed to report what she told them. *Id.* ¶¶ 25, 32, 72. Third, the Article omits (1) how the WSJ Defendants obtained a copy of the letter; (2) how and why the voiceover in Letter was typewritten; (3) who typed the voiceover; (4) how the voiceover was confirmed to be in the third person; (5) how the contents of the Letter, including the signature, were verified, if at all; (6) the steps the WSJ Defendants took to verify that President Trump signed the Letter; (7) why the WSJ Defendants did not publish the Letter in the Article; and (8) President Trump's denial that he signed the letter *Id.* ¶¶ 53*,* 57-60. And fourth, the WSJ Defendants (1) used the September 8 Article "to whitewash their journalistic shortcomings" and (2) could and should have included the September 8 Article's analysis in the Article because the signature in the Birthday Book looked different than President Trump's actual signature. *Id.* ¶¶ 62-63, 65-66.[9]

The Amended Complaint alleges that because Safdar and Palazzolo were acting within the course and scope of their employment when they authored and published the Article, their actions are attributed to Dow Jones and News Corp. It attributes the WSJ Defendants' purported malice to Murdoch because he owned and controlled Dow Jones and News Corp. [ECF No. 67 ¶¶ 73-74]. Other that stating that Dow Jones and News Corp published the Article "at the direction of Defendants Murdoch and Thomson[,]" *id.* ¶ 50, the Amended Complaint is devoid of any allegations about how Thomson acted with actual malice.

### H. Defendants' Motion to Dismiss

On June 10, 2026, Defendants moved to dismiss the Amended Complaint with prejudice arguing that it fails to plausibly allege claims for defamation *per se* or defamation *per quod*. Along with dismissal, Defendants seek attorneys' fees under Florida or New York's anti-SLAPP laws.[10]

[9] The Amended Complaint alleges that the September 8 Article "wrongly claims that the alleged 2003 letter contains President Trump's signature." [ECF No. 67 ¶ 64]. The September 8 Article, however, makes no such statement. Rather, it refers to "the letter bearing Donald Trump's name. . ." [ECF No. 68-7].

[10] SLAPP stands for "Strategic Lawsuits Against Public Participation." Fla. Stat. § 768.295.

## II. LEGAL STANDARD

To survive a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6), a claim "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" meaning that it must contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007)). While a court must accept well-pleaded factual allegations as true, "conclusory allegations . . . are not entitled to an assumption of truth—legal conclusions must be supported by factual allegations." *Randall v. Scott*, 610 F.3d 701, 709-10 (11th Cir. 2010). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Therefore, a complaint that merely presents "labels and conclusions or a formulaic recitation of the elements of a cause of action" will not survive dismissal. *Id.* (internal quotation omitted). When reviewing a motion to dismiss, a court must construe the complaint in the light most favorable to the plaintiff and take the factual allegations therein as true. *See Brooks v. Blue Cross & Blue Shield of Fla. Inc.,* 116 F.3d 1364, 1369 (11th Cir. 1997).

## III. DISCUSSION

Defendants argue that the Amended Complaint fails to state a claim for defamation because (1) the Article is true; (2) the Article is not defamatory; (3) it does not plausibly allege that Defendants published the Article with actual malice; and (4) it fails to allege special damages for the defamation *per quod* claim. [ECF No. 68]. As with its Order dismissing the Complaint, [ECF No. 59], the Court must first determine which documents outside the Amended Complaint, if any, it can consider at this stage of the litigation.

### A. Incorporation by Reference

Defendants ask the Court to incorporate by reference the Article, Birthday Book, Produced Letter, and the September 8 Article. In reviewing a 12(b)(6) motion, the Court is largely limited to the allegations in the Complaint and the attached exhibits. *See Financial Sec. Assur., Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1284 (11th Cir. 2007). However, "a document attached to a motion to dismiss may be considered by the court without converting the motion into one for summary judgment only if the attached document is: (1) central to the plaintiff's claim; and (2) undisputed." *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002). "Undisputed in this context means that the authenticity of the document is not challenged." *Id.* (internal quotation omitted). Notably, "a document need not be physically attached to a pleading to be incorporated by reference into it; if the document's contents are alleged in a complaint and no party questions those contents, [the court] may consider such a document provided it meets the centrality requirement imposed in *Horsley*." *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005).

The Article and the September 8 Article are both incorporated by reference into the Amended Complaint. President Trump details their contents in the Amended Complaint, they are central to his defamation claims,[11] and he does not dispute their authenticity. However, the Court continues to find that the Birthday Book and Produced Letter are different. Though central to the claims in the Amended Complaint,[12] President Trump disputes their authenticity. The Court cannot make a factual finding, at this time, that the documents produced by the Epstein Estate are the same documents referenced in the Article. Moreover, President Trump disputes that he wrote or

[11] The Amended Complaint alleges that the September 8 Article supports a finding of actual malice. [ECF No. 67 ¶ 62].

[12] The Birthday Book and Produced Letter's very existence bears on whether the Article is true and, even if it is false, whether Defendants acted with actual malice.

signed the Produced Letter. Because of these factual disputes, the Court denies Defendants' request to incorporate by reference the Birthday Book and Produced Letter.

**B. Defamation**

To state a claim for defamation under Florida law,[13] a plaintiff must allege five elements: "(1) publication; (2) falsity; (3) the statement was made with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) the statement must be defamatory." *Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018). "[D]efamation claims can be proven in either of the following ways: (1) defamation *per quod*, which 'requires an additional explanation of, or an interpretation of innuendo suggested by the words used to demonstrate the defamatory meaning or that the plaintiff is the subject of the statement[,]' or (2) defamation *per se*, which 'does not require any additional explanation in order to prove the defamatory nature of the statement.'" *Mac Isaac v. Twitter, Inc.*, 557 F. Supp. 3d 1251, 1259 (S.D. Fla. 2021) (quoting *Scobie v. Taylor*, No. 13-60457, 2013 WL 3776270, at *2 (S.D. Fla. July 17, 2013)). "Because defamation *per quod* requires additional explanation of the words used to show that they have a defamatory meaning, . . . the plaintiff must allege and prove special damages." *Block v. Matesic*, 789 F. Supp. 3d 1131, 1155 (S.D. Fla. 2025) (internal quotation omitted).

Defendants argue that the Amended Complaint fails to adequately allege (1) that the statements in the Article are false or defamatory, (2) actual malice, or (3) special damages for the defamation *per quod* claim.

---

[13] Although the parties disagree over whether Florida or New York law governs this action, they agree that, for purposes of adjudicating the defamation claims, Florida and New York defamation law are the same. As the Court sits in diversity in Florida, it applies Florida choice-of-law rules. *See In re January 2021 Short Squeeze Trading Litigation*, 76 F.4th 1335, 1346 (11th Cir. 2023). "And under Florida choice-of-law rules, a court need not resolve a choice-of-law dispute if there is a false conflict, such that the different laws point to the same outcome under the facts of the case." *Id.* (internal quotation omitted). Because the outcome of the Motion to Dismiss is the same under Florida and New York law for the defamation claims, the Court declines to resolve the parties' choice-of-law dispute at this time.

### 1. Truth and Whether the Statements are Defamatory

Defendants ask the Court to make a factual determination that the statements in the Article are true and a legal determination that they are not defamatory.[14] Because the Court finds that the Amended Complaint fails to adequately allege actual malice, it declines to address these issues. And, whether President Trump was the author of the Letter or Epstein's friend are questions of fact that cannot be determined on a motion to dismiss.

### 2. Actual Malice

To prove a defamation claim, public figure plaintiffs must show that "the defendant made the alleged defamatory statement with 'actual malice[.]'" *Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 6 F.4th 1247, 1252 (11th Cir. 2021) (quoting *Sullivan*, 376 U.S. at 279-80).[15] As the Eleventh Circuit has instructed, a public figure plaintiff must plead actual malice in accordance with the *Twombly/Iqbal* plausibility standard:

> In these cases, there is a powerful interest in ensuring that free speech is not unduly burdened by the necessity of defending against expensive yet groundless litigation. Indeed, the actual malice standard was designed to allow publishers the "breathing space" needed to ensure robust reporting on public figures and events. Forcing publishers to defend inappropriate suits through expensive discovery proceedings in all cases would constrict that breathing space in exactly the manner the actual malice standard was intended to prevent. The costs and efforts required to defend a lawsuit through that stage of litigation could chill free speech nearly as effectively as the absence of the actual malice standard altogether.

*Michel*, 816 F.3d at 702 (quoting *Sullivan*, 376 U.S. at 271-72); *see also St. Amant v. Thompson*, 390 U.S. 727, 732 (1986) (holding that "to insure the ascertainment and publication of the truth about public affairs, it is essential that the First Amendment protect some erroneous publications

---

[14] "Whether a statement is reasonably capable of a defamatory interpretation is a question of law for the Court to determine prior to the jury's evaluation of whether the statement was in fact understood as defamatory" unless "a publication is susceptible of two reasonable interpretations, one of which is defamatory" – which then becomes an issue "of fact for the jury." *Mac Isaac*, 557 F. Supp. 3d at 1257 n.5 (internal quotations and citations omitted).

[15] "[W]hether an individual is a public figure—and thus subject to the actual malice analysis—is a question of law for the court to decide." *Michel*, 816 F.3d at 702. Here, there is no dispute that President Trump is a public figure.

as well as true ones"). Therefore, "to plead actual malice, [President Trump] must allege facts sufficient to give rise to a reasonable inference that the false statement was made with knowledge that it was false or with reckless disregard of whether it was false or not." *Turner*, 879 F.3d at 1273 (internal quotation omitted). "This is a subjective test, focusing on whether the defendant 'actually entertained serious doubts as to the veracity of the published account, or was highly aware that the account was probably false.'" *Id.* (quoting *Michel*, 816 F.3d at 702-03).

In some circumstances, actual malice can be inferred "where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call[,] . . . [or] when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation[, or] where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *St. Amant*, 390 U.S. at 732. However, "[a]ctual malice requires more than a departure from reasonable journalistic standards . . . [t]hus, a failure to investigate, standing on its own, does not indicate [its] presence . . . ." *Michel*, 816 F.3d at 703.

Here, the Amended Complaint falls short of pleading actual malice. Indeed, the allegations regarding malice are conclusory, vague, sometimes inconsistent with the Article, and often irrelevant to whether Defendants knew or should have known that the statements in the Article were purportedly false.

**a. Conclusory Language is not Enough**

As an initial matter, President Trump's conclusory allegations that Defendants acted with malice because they "knew or should have known" the statements in the Article were false, [ECF No. 67 ¶¶ 94, 109], are insufficient to state a claim. *See Reed v. Chamblee*, No. 24-10058, 2025 WL 1874638, at *3 (11th Cir. July 8, 2025) (finding the plaintiff's conclusory assertions that the defendant acted with actual malice insufficient).

**b. Denial is not Enough**

Though vague, the Amended Complaint appears to allege that by choosing to publish the Article despite President Trump's and his team's denials, Defendants acted with actual malice. In effect, President Trump argues that once he declared the Letter a "fake," Defendants should have disregarded everything else they learned in their investigation and not published the story. But that is not what the actual malice standard requires and runs afoul of the First Amendment. Indeed, were that the law, any time a public figure or his team denies an accusation, journalists would be immediately blocked from publishing negative or contradictory press—a result that flies in the face of the "American privilege to speak one's mind, although not always with perfect good taste, on all public institutions[.]" *Sullivan*, 376 U.S. at 269 (quoting *Bridges v. California*, 314 U.S. 252, 270 (1941)). Moreover, the Article did not ignore or minimize President Trump's denial. Rather, it informed readers that President Trump decried the Letter as a fake and denied writing it. By "allowing readers to decide for themselves what to conclude from the [Article], . . . any allegation of actual malice [is] less plausible." *Turner*, 879 F.3d at 1274; *see also Michel*, 816 F.3d at 703 (holding that "reporting perspectives contrary to the publisher's own should be interpreted as helping to rebut, not establish, the presence of actual malice").

**c. The Investigation**

President Trump's argument that the WSJ Defendants' investigation was inadequate, and therefore an indication of malice, fares no better. As detailed above, a failure to investigate, without more, does not establish actual malice. *Id.* Rather, "a plaintiff must show the defendant deliberately avoided investigating the veracity of the statement in order to evade learning the truth." *Reed*, 2025 WL 1874638, at *3. The Amended Complaint comes nowhere close to this standard. Indeed, the Article details a thoughtful and detailed investigation. Before running the story, Defendants contacted President Trump and his team, Justice Department officials, and the FBI for comment.

President Trump and his team responded with his denial, the Justice Department did not respond at all, and the FBI declined to comment. Defendants also attempted to speak with Maxwell; she did not respond to their request and her attorney stated that she was focused on her case before the Supreme Court. In addition, Defendants reached out to other individuals named in the Birthday Book, including Leslie Wexner and Alan Dershowitz, and to individuals involved in binding the Birthday Book, who confirmed that Weitz put the book together. In short, President Trump's allegation that Defendants failed to conduct an adequate investigation is rebutted by the Article and is insufficient to establish actual malice. *See Michel*, 816 F.3d at 704 (holding that plaintiff did not adequately allege malice where the record "indicate[d] that the reporters conducted some outreach and engaged in due diligence").[16]

Grasping at straws, the Amended Complaint attempts to manufacture flaws with the investigation. First, it alleges that the investigation was lacking because Defendants only reviewed the Letter but did not have a copy in their possession. The Court cannot discern any substantive difference—and certainly not one that would establish actual malice—between Defendants reviewing the Letter before publication and obtaining a copy of the Letter. Defendants reviewed the Letter and later reported on its contents. Nothing in the law suggests that Defendants needed to obtain, retain, or publish a copy.

In addition, President Trump's focus on Maxwell is entirely misplaced. The Eleventh Circuit has found "allegations that the Defendants failed to fully investigate their statements by intentionally choosing not to speak with any witnesses who could have refuted the allegedly

[16] President Trump argues that *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 692 (1989), supports his position that Defendants' purported failure to investigate is enough to support an inference of actual malice. However, in *Harte-Hanks*, the Supreme Court expressly stated that "[a]lthough failure to investigate will not alone support a finding of actual malice, the purposeful avoidance of the truth is in a different category. *Id.* (citing *St. Amant*, 390 U.S. at 731). Here, President Trump has not alleged any facts, beyond conclusory allegations, that support an inference that Defendants purposefully avoided the truth.

defamatory statements" insufficient to plead actual malice. *Reed*, 2025 WL 1874638, at *3. And any argument that Defendants "purposely avoided" the truth by either not disclosing what Maxwell told them or by refusing to speak with her is difficult to reconcile with President Trump's own allegations. The Amended Complaint alleges that "Maxwell has stated, subject to penalty of perjury for lying to a federal officer, that she did not remember President Trump submitting a letter for Epstein's 50th birthday." [ECF No. 67 ¶ 33].[17] Based on this allegation, Maxwell had little to offer to Defendants' investigation. In short, references to Maxwell are a red herring and simply do not establish that Defendants "actually entertained serious doubts as to the veracity of the published account[] or was highly aware that the account was probably false." *Michel*, 816 F.3d at 703.[18]

**d. Omissions**

President Trump's argument that the Article omits certain facts does not save his claims. First, how or why the voiceover in the Letter was typewritten or how the voiceover was confirmed to be in the third person are inconsequential details that have no bearing on whether Defendants published the Article knowing its contents were false or with reckless disregard as to its falsity. Moreover, Defendants' decisions about how to investigate and what to include in the Article do not establish malice. "Obviously the author of an article will have to choose which facts to include and which to omit. It is impossible to print all of the facts on which an opinion or belief is based . . . . Were the courts or criticized [parties] to be allowed to dictate the contents of such articles,

---

[17] In his opposition to the Motion, President Trump argues that Defendants improperly rely on the transcript of Maxwell's Department of Justice interview because it is outside of the Amended Complaint and cannot be considered as evidence of the truth of Maxwell's testimony. While the Amended Complaint includes a hyperlink to the full transcript, the Court agrees that it cannot rely on the transcript at this stage of the litigation. However, for purposes of this Order, the Court must accept as true the allegations in the Amended Complaint, including that Maxwell stated, under penalty of perjury, that she did not remember whether President Trump submitted a letter for the Birthday Book. [ECF No. 67 ¶ 33].

[18] The Court notes that Maxwell's interview with the Department of Justice was *after* Defendants published the Article. Therefore, Defendants could not have included a discussion of it in the Article.

censorship would have won out over free speech and the right to dissent." *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 285 (S.D.N.Y. 2013) (internal quotation omitted).

Finally, the allegation that Defendants intentionally omitted President Trump's denial that he signed the Letter or a discussion on whether the signature on the Letter is authentic, [ECF No. 67 ¶¶ 57-60], is belied by the Article. It states, multiple times, that President Trump denies writing the Letter and that "[i]t isn't clear how the letter with Trump's signature was prepared." [ECF No. 68-2]. This is more than sufficient to encompass any denial that he "signed" the Letter or that the signature on the Letter is authentic.[19]

#### e. The September 8 Article

The Amended Complaint's reliance on the September 8 Article to establish malice is equally unavailing. Nothing in the law suggests that a journalist must report on every piece of evidence they uncover before going to print. *See Biro*, 963 F. Supp. 2d at 286. Moreover, it is unclear why President Trump argues the September 8 Article shows that his signature "could not be more different" than the one in the Letter, when it contains several examples where President Trump's actual signature and sketches are similar to those in the Letter. [ECF No. 67 ¶¶ 62, 65-66]. At bottom, the September 8 Article does not support a finding that Defendants knew or should have known that President Trump did not sign the Letter.

* * *

[19] In his opposition to the Motion, President Trump argues that the Article's statement that "[i]t isn't clear how the letter with Trump's signature was prepared[,]" [ECF No. 68-2], "did not cure the accusation [in the Article and] highlighted the defamatory nature of the statements." [ECF No. 70]. President Trump's argument misses the mark. As detailed above, the Article presented the results of the WSJ's investigation, President Trump's and his team's denials, and the WSJ's own assessment that it was not clear how the letter was prepared. As a result, readers could reach their own conclusions about the Article and authorship of the Letter, "making any allegation of actual malice less plausible." *Turner*, 879 F.3d at 1274.

As President Trump has not plausibly alleged that each Defendant made defamatory statements with actual malice,[20] the Amended Complaint must be dismissed. And because this is President Trump's second attempt to allege his claims, the Court finds that dismissal with prejudice is appropriate. *See Reed*, 2025 WL 1874638, at *3 (dismissing defamation claim with prejudice where the plaintiff "had two opportunities to plausibly allege claims for defamation in his lengthy complaints but [] failed both times to sufficiently allege any Defendant acted with actual malice").[21]

**C. Attorneys' Fees and Costs**

Within the Motion, Defendants request attorneys' fees and costs, arguing that President Trump's lawsuit lacks merit and that he only brought it because they exercised their right to free speech on a public issue. The Court agrees that President Trump's defamation claims lack merit. However, based on the parties' limited briefing, it is unclear whether Florida or New York's anti-SLAPP statutes apply. This is significant as several federal district courts have found that New York's anti-SLAPP statute "precludes a Section 70-a fees application brought by motion in federal court." *Rapaport v. Finkelman*, No. 24-CV-5942, 2026 WL 2583071, at *3 (S.D.N.Y. Sep. 1, 2026) (collecting cases). According to those cases, the statute requires the defendant to "maintain an action, claim, cross claim or counterclaim" to recover attorneys' fees. *See* N.Y. Civ. Rts. L. §

---

[20] A plaintiff must "plead, and then prove, that each defendant acted with actual malice." *Biro*, 963 F. Supp. 2d at 276. While the Amended Complaint does a better job than the Complaint at separating the actions of each Defendant, the Court finds that many of the allegations still lump the Defendants together. In addition, the Amended Complaint is devoid of any non-conclusory allegations about Thomson's purported malice.

[21] Even if the Amended Complaint had adequately alleged actual malice, the defamation *per quod* claim is subject to dismissal for failure to allege special damages. *See Block*, 789 F. Supp. 3d at 1155. "Special damages are actual, out of pocket losses which must be proven by specific evidence as to the time, cause and amount; whereas, general damages encompass the more customary harms inflicted by a defamatory falsehood, such as impairment of reputation and standing in the community." *Falic v. Legg Mason Wood Walker, Inc.*, 347 F. Supp. 2d 1260, 1268 (S.D. Fla. 2004). The "chief characteristic of special damages is a realized or liquidated loss." *Blythe v. Fifth Third Bank*, No. 2010 WL 11432601, at *6 (M.D. Fla. Jan. 19, 2010). President Trump alleges that his special damages "include, but are not limited to, lost profits, out of pocket losses, and realized losses in the form of reputational harm." [ECF No. 67 ¶ 120]. Reputational harm, however, is not a special damage. *See Falic*, 347 F. Supp. 2d at 1268. Moreover, this allegation, without more, is too conclusory to plead special damages.

70-a(1). However, courts analyzing the application of Florida's Anti-SLAPP Statute's fee-shifting provisions have found that a request for attorneys' fees under the statute may be brought by motion. *See, e.g. Bongino v. Daily Beast Co., LLC*, 477 F. Supp. 3d 1310, 1323 (S.D. Fla. 2020).

Because the parties have not fully briefed which law applies to Defendants' request for attorneys' fees or whether there is a true conflict between those laws, the Court will not address Defendants' entitlement to attorneys' fees at this time. Defendants may file a motion for attorneys' fees, pursuant to Local Rule 7.3, that addresses which law should apply and whether, under that law, they are entitled to attorneys' fees in this action.

**IV. CONCLUSION**

Based on the foregoing, it is **ORDERED AND ADJUDGED** as follows:

1. Defendants' Motion to Dismiss the First Amended Complaint, [ECF No. 68], is **GRANTED**. The First Amended Complaint, [ECF No. 67], is **DISMISSED WITH PREJUDICE**.
2. The Court reserves jurisdiction to adjudicate attorneys' fees and costs.
3. Any motion for attorneys' fees shall be filed within thirty (30) days of this Order. The motion shall include a choice of law discussion.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 31st day of October, 2026.

**DARRIN P. GAYLES**
**UNITED STATES DISTRICT JUDGE**